Good morning, Your Honors. May it please the Court, I'm David Eisenberg, excuse me, and I represent the petitioner Andrew Allerdice and this is a petition for habeas corpus pursuant to 2254. I would ask for two minutes rebuttal, Your Honor. Your Honor, the question here is how close do the facts in this case, which involves stipulations and a jury charge, come to the point where what occurred was a deprivation of the appellant's due process right? Because, in effect, what happened was a combination of those two events created the functional equivalent of a guilty plea. So when the defendant at the trial level objected in open court to the submission of those stipulations, what he was saying was, I want a trial. And he was aware of the fact that the stipulations combined with the charge on a presumption of intent to defraud, as given by the trial judge pursuant to Arizona law, would just about take him right out of court. Counsel, one of the problems I have with your argument is that it appears that the theory of the defense was that Mr. Allerdice was a victim of the fraud perpetuated by Mr. Pisciotta, if I'm pronouncing it correctly. That's correct, Your Honor. And it seems to me that while lawyers and judges can draw fine analytical distinctions between it wasn't me who did it, but if I did it, I was the victim of a fraud, that doesn't work very well with juries. Well, Your Honor, I don't see it that way, with all due respect, because I don't think it's a dichotomy that the Court is just setting out. What could have happened here, in order to have avoided that issue, was make the State prove its case. One doesn't need to concede it's either-or. And make the State bring in the witnesses who would say, yes, Allerdice, he was here, he presented the check. But who would the witnesses have been? They would have been the victims of the scheme, the check-kiting scheme. It would have been merchants and counterclerks and bankers, so that Mr. Allerdice would basically have to sit there while the jury saw this parade of very credible witnesses that are unlikely to be shaken much on cross-examination. With due respect, Your Honor, I think that takes too much out of what happened below. I don't think, from my reading of this record, that those people were interviewed. Some may have been. But the problem for Mr. Allerdice here and his counsel was, you had something like 24, 28 fraudulent devices. If you don't contest the existence of those devices and the act of which is required of presentment or possession, then you are just about out of court, because the reality, Your Honor, of trial practice would be with that jury charge and those checks and the jury charges given by a judge, a person who would be well respected by a jury, you have the right to consider the inference of intent to defraud, you must beat back the number of checks, because But that still doesn't undercut the defense theory that I am the victim as well. And in fact, if you're trying to get the jury to focus on that, you really want to have the jury sit there while six foundational authentication witnesses come in and establish that this is a business record of the bank and here is a photograph from the bank surveillance camera of the person who opened the account. My experience in trying cases has been that the jury is half asleep after the third witness. And maybe that's the State's problem. Now, I don't mean to be – I'm not trying to be devious at all. It's not the State's problem, or it inerrs to the detriment of the defendant, because the jury usually knows that it's the defendant who's insisting on all these foundational witnesses when a simple stipulation as to the admissibility of the fact that he opened the account would eliminate six witnesses. I would agree with that, Your Honor, if we're dealing with one or two. It seems to me that what we have here is the defense counsel had a theory of a case that he thought would best serve his client. Now, you and I, me as a past trial lawyer, you may be wrong, but he developed what he thought was a coherent theory of the defense. And so I don't think chronic can help you. And so it's really a question of whether entering into this stipulation was so far afield that it didn't help the client and couldn't help the client, and everybody knew that it couldn't. I think it's a little bit – the analysis should be a little bit different, Your Honor. It's not simply whether there were stipulations to be entered and what perhaps might have been a different trial tactic. It's that the client himself said, I want a trial, and I don't want these stipulations. And that was very clear. We'll leave aside the fact that he heard about them the day before trial. What's the law on how much you can disregard the specific instruction on a particular point from your client? Is Your Honor referring to the – I don't think the lawyer has to do exactly what the client wants if he thinks it's against his interest. No, Your Honor. Your Honor, I don't think that's quite correct if what the client wants is a true trial or, to put it a different way, not to be shoehorned into the presumption of guilt, not even guilt. In effect, what he's doing is saying, I had the intent, I had 24 whatever checks, therefore, as charged by a judge, I had the intent to commit fraud. You cannot let that go. You cannot let that go to a jury, even if your theory of the defense is, well, I was the victim. Because, as he said, either he would be dumb as a bowling ball or the sharpest conniver in the world in order to get away with something like this. And when one looks at the presumption or the inference that can be drawn from that, juries intuitively, when they hear that from a judge and they hear what that charge is, they come away with nothing more than to say, this must be so. We heard it from the court, and the court is an imprimatur. Mr. Eisenberg, to follow up on Judge Fletcher's question, does that mean that if at the conclusion of the testimony of the State's witness on direct examination, the lawyer in his or her professional judgment thinks that the witness didn't hurt Mr. Allardyce, therefore, I'm not going to cross-examine this witness, that if Mr. Allardyce objects, the lawyer has to cross-examine, even if the result is that it repeats all the testimony on direct and hammers home what the prosecutor was trying to show with the witness? No, Your Honor. I think you have to take each situation on a case-by-case basis. So the client can object on occasion to a lawyer's trial strategy, and the lawyer can still pursue that strategy without violating the strict law. I agree. But when the objection by the client is so fundamental to the issue of guilt, in this case, the element of intent, I think the client's wish has to be observed, and I think there was a way to do that, preserve his, either the Brookhart idea or his Sixth Amendment right to counsel, effective assistance of counsel, by challenging the State and having the State come in and put on its proof. And as I said before, if you can whittle the number of checks down by a conceivable amount, you might have a better chance at escaping a jury verdict that took less than, well, I think it took two hours, and it occurred over lunch. Surely this jury went out thinking the judge has told us basically what to determine and we're going to do it. And, you know, the prosecutor used the judge's charge quite effectively. He said something to the effect that here you have a certain amount of checks. The charge is that if you have more than five checks, the defendant has committed intent to commit fraud. And I think here's what he said on summation. So when Allardyce presented this forged instrument, and he was holding up, I think it was the check to Albertson's. At Albertson's, he said a few more things, and then he said he committed forgery just by merely having possessed that check. And I say that that is not the trial that Mr. Allardyce wanted. And I think in this situation, the client is entitled to say to his attorney, this is so fundamental to my idea to having a trial, even though his theory may not be the best, that is the client's theory, is entitled to have that go forward. How long did the trial take? I think it took about one full day, and it may have gone into a second day. Counsel, wasn't the issue of intent still in play, though, even after the stipulations? Well, I think you're referring to the theory that I was a victim. And so, yes, it would be in play, but I think in play has a certain value judgment to it. I think the ball was hit into the net in that sense, meaning that there really was no issue of intent with this jury charge in these stipulations. Mr. Eisenberg, thank you very much. You're out of time, and we'll hear from the State. May it please the Court. My name is Joe Maziarz. I'm an Assistant Arizona Attorney General representing respondents in this matter. I'd like to begin by first discussing the first issue, which is whether trial counsel was ineffective in entering into the stipulations regarding the checks and bank documents. As we've laid out in our answering brief, the record clearly reflects that counsel spent a considerable amount of time, gathered over a thousand documents, before entering those stipulations. This was a nine- to ten-month period that began in September of 2001 and continued to July of 2002. He interviewed numerous witnesses, including custodians of record. He even retained, and this is something unusual, he retained a handwriting expert to evaluate whether, in fact, those signatures on the checks were Allardyce's, and only after receiving that report did he enter the stipulations. I also would like to point out that Allardyce admitted all this. When he was interviewed by Detective Harry after he was arrested, he claimed he was in the car business, he was building and restoring cars, and he admitted receiving these Mountain State checks, depositing them, cashing them, and claimed that he thought they were legitimate business and he was just a businessman and essentially was victimized by Mountain State, which is the eight checks upon which the forgery accounts are premised. Even Allardyce himself admitted that his trial attorneys, and I quote, my attorneys had to go through a lot to get this case together. And that was only a month and a half before trial and before the formal stipulations were entered. Allardyce claims he wasn't aware of these stipulations, but that's simply belied by the record because on the date of the first day of trial when the formal stipulations were submitted to the court, Allardyce objected and told the judge, I told my attorney, I sent my attorney a letter over 30 days ago telling him I didn't want to enter these stipulations. Clearly, this was a tactical decision made by counsel. This is the type of decisions counsel makes. And there was a very important issue. And, in fact, the only viable issue in this case was the intent to defraud. Was Allardyce, as he claimed to Detective Harry after he was arrested, a legitimate businessman simply in the car business, or was he, in fact, passing bad checks that he knew were bad? That was the only issue. And counsel was very effective in arguing his case to the jury. And I usually don't do this, but I think I quoted about three or four pages of counsel's closing argument, which highlights the fact that he told the jurors, look, we're not trying to hide behind anything. His telephone number on some of the checks, his driver's license on some of the checks. One of the checks even had Allardyce's fingerprint. We're not contesting that. We're simply here to tell you he was victimized by Paul Piscicottota, whatever his name was. I can't pronounce either, Your Honor. And there was no intent to defraud. It was a very viable defense. Obviously, the jurors didn't buy it, but that was the only defense available to counsel in this case. I think Judge Tallman pointed out something pretty important. These are the type of tactical decisions counsel have to make. If he would have required the State to bring in witness after witness after witness after witness, that would have simply reinforced the fact that Allardyce had passed numerous bad checks. He already admitted it, so that was going to be proven anyway. It made no sense from counsel's perspective to do this. And, of course, there's no prejudice, as we noted. Not only did he admit it, the State had the witnesses, the documents available that counsel had viewed beforehand and would have simply proved what Allardyce had already admitted. I'd like to move on to the second issue, which I think is a little more interesting. And this Court ordered supplemental briefing on the so-called Brockhart issue. And that's the claim that by not keeping him reasonably informed, somehow that waived his right to confrontation. And under this 1966 U.S. Supreme Court case, Brockhart, that violates due process. I'd like to point out it's clear from the record, and I think we've laid this out in our supplemental brief, that in his State PCR, he raised only a Sixth Amendment claim. He didn't even raise a chronic claim in regard to the reasonably informed issue. He didn't mention due process, certainly didn't mention Brockhart or any cases citing Brockhart. And I would also want to point out to the Court that that was a counseled petition. He had counsel in State court. And an en banc decision of this Court, Peterson v. Lampart, holds that when you have counsel in State court and counsel decides to raise a particular issue, this Court is going to strictly construe that document filed in State court. And similarity of claims, the facts underlying those claims, that's not sufficient to preserve a specific claim that's later raised in Federal court. But even looking at his Federal petition, he never raised a Brockhart claim. He mentioned the same facts he had mentioned in his State petition and called it a Fourteenth Amendment claim. Didn't even call it a due process claim. Again, didn't mention Brockhart. Didn't cite any cases citing Brockhart. It was the district court magistrate who, in his opinion, determined that the facts underlying this reasonably informed Sixth Amendment claim would support a Brockhart claim. But, you know, the district court can't on its own raise a claim that hasn't been raised in State court or in the habeas petition. As we pointed out in our supplemental brief, Allardyce at this point has no State remedy available to him. He would be both time barred and precluded under Arizona law from trying to go back to State court, file a PCR, and raise the claim. And therefore, the claim is procedurally defaulted and barred from this Court's review. I just have an information question. I pulled up the electronic record, but no place could I get all of the checks. Where are the checks? You know, I've never seen the checks. All we have is the stipulation. And it's ER 538 through, I think, 540. And that just goes through the exhibit numbers, stipulate to, stipulate to. I don't recall. I did the direct appeal on this years ago in State court. And I think the exhibits were admitted, the checks themselves were admitted in State court, but I'm not sure. So I've not seen the checks myself. We have these stipulations that stipulate to what the checks were, who they were made out to, and that kind of thing. Did it stipulate to all of this stuff about the Social Security numbers and the one-off and the wrong telephone number and so forth? Was that all stipulated to? I know there was testimony from Detective Harry. That the, of what the Social Security numbers on a couple of the checks were. So I think whether the checks themselves were admitted in evidence in State court, and I believe they were, though I'm not sure, I believe at least Detective Harry had testified that there were two or three different Social Security numbers on some of those checks. But that doesn't really, I think, affect this case. But in being a judge at the appellate level, you want to look at everything. Well, and that may be true generally, Your Honor, but I think in this case, really, intent is the whole case. I mean, this case rises and falls on intent. I'm saying that I don't think it has an effect here, but I'm just curious. I'd like to see everything that was there. Well, I know Mr. Eisenstein's provided a quite extensive excerpt of record, but I don't know, I don't think those checks. It's not an uncommon problem in my experience. I agree with Judge Fletcher. It's very frustrating when counsel overlook what are sometimes the most significant pieces of evidence in the case because it's not a transcript. Right. They just don't give us copies of the exhibits. Well, you know, as an appellate attorney on direct appeal in State court, we have these same problems. We have to track down sometimes the superior court. Very important exhibits. In this case, obviously, the checks themselves, there's stipulations. They're not important. The only issue really in this case was intent. Well, it's important. Excuse me. It's important in the sense that we needed to get the complete picture of the trial that took place so that we can. Yeah, I agree. But, again, through the testimony of the witnesses and, again, the stipulations that these checks existed and that they were passed and that there was insufficient funds, the checks themselves aren't really important. Think of it like watching a television program with the volume turned down. Well, I just raised this issue because it frustrates me. Sorry, Your Honor. I wish the checks were in the record. And, like I said, I believe they were in the State court record. But, obviously, we don't get copies of them on appeal, so we can't make them part of the record in the district court unless the district court specifically asks. Unless the court has any questions, I'll conclude my argument. Thank you very much, Counsel. The case just argued is submitted.
judges: Fletcher B. , Tallman, Rawlinson